### Thomas Ellicott and Jonathan Meredith, plaintiffs in error v. William Pearl.

At the trial of a writ of right, in the circuit court of Kentucky, a witness was offered to prove that one Moore, who was dead, and whose name was put down as one of the chain carriers in making the original survey, and who was subsequently present when lines were run on the same land, had declared, that a certain corner was the corner made by the surveyor, Kincaid, when the original survey was made and the line run by the direction of the surveyor, for the original survey. The circuit court rejected the evidence. Held, that the circuit court did not err in rejecting this evidence.

The evidence was not merely hearsay; but hearsay not to matters of general reputation, or common interest among many.

The general rule is, that evidence, to be admissible, should be given under the sanction of an oath, legally administered: and in a judicial proceeding, depending between the parties affected by it, or those who stand in privity of estate or interest with them. Hearsay is admitted in cases of pedigree, of prescriptive rights and customs, and some other cases of a public, or quasi public nature. In cases of pedigree, it is admitted upon the ground of necessity, or the great difficulty, and sometimes the impossibility, of proving remote facts of this sort by living witnesses But in these cases it is only admitted when the tradition comes from persons intimately connected, or in close relation with the family, or from sources of a kindred nature; which, in a general sense, may be said to import verity: there being no lis nota or other interest to affect the credit of their statement.

In cases of prescriptive rights and customs, and other claims of a public nature, tradition and reputation have been in like manner admitted. They are all cases of a general right, affecting a number of persons, having a common interest.

The distinction seems now clearly established in England, that hearsay, or reputation, or tradition, is not admissible in cases of mere private rights; but only in cases of public rights, or those quasi publici, involving similar interests of a number of persons. Perhaps a reason may be found which, upon principle, would well support this distinction. It is that, in regard to private rights, the acts, profession and assertion of title by the parties claiming for themselves are, in all cases, susceptible of direct proof: but in cases of public rights, the acts, profession and assertion of title by many persons, not in privity with each other, cannot be explained or qualified to be in furtherance of a common public right; unless the evidence of general reputation were admissible to explain the intention and objects of the parties in those acts, or that possession or assertion of title; that is to say, whether done in furtherance of a common right or of a private right.

Kincaid had been examined as a witness for the demandants (by way of deposition), and the tenants, thereupon, gave in evidence the conversations and declarations of Kincaid, to certain witnesses, in order to discredit his (Kincaid's) testimony, and to show that he had stated that the survey was made by him, at the mouth of Raccoon creek, for Remey; when it was his interest to place it at Pond creek. The demandants then, with a view to sustain Kincaid, and to support the statements

[Ellicott v. Pearl.]

going to his interest, offered witnesses to prove the statements and conversations of Kincaid at other times, corresponding with the statements in his deposition, relative to his making the surveys of Thompson and Remey; and it being suggested by the demandants, upon an inquiry from the court, that these statements and conversations were *subsequent* to that testified to by the tenant's witnesses; the court, upon an objection taken by the tenants, excluded the evidence. By the Court. The evidence was properly excluded. Where witness proof has been offered against the testimony of a witness under oath, in order to impeach his veracity; establishing that he has given a different account at another time: we are of opinion that, in general, evidence is not admissible in order to confirm his testimony, to prove that at other times he has given the same account as he has under oath: for it is but his mere declaration of the fact; and that is not evidence. His testimony under oath is better evidence than his confirmatory declarations not under oath; and the repetition of his assertions does not carry his credibility further, if so far as his oath. This is said in general, because there are exceptions: but they are of a peculiar nature, not applicable to the circumstances of this case: as where the testimony is assailed as a fabrication of a recent date, or a complaint recently made; for there, in order to repel such imputation, proof of the antecedent declaration of the party may be admitted.

The tenants, in order to prove the boundaries of the demandants' land, as laid down in the plat, and claimed by them, gave in evidence the original plats and certificates of survey of their two thousand and one thousand acre tracts; and then examined M'Neal, a witness for the demandants, who was first introduced to prove their boundary; who stated that the water courses, as found on the ground, did not correspond with those represented on the said plats: and after being examined by the demandants, for the purpose of proving that the marks on the trees, claimed by them as the corner and lines of their surveys, were as ancient as the said surveys, and also as to the position and otherwise of the lines and corners claimed by them, and represented on the plat made and used at the trial; stated on the cross-examination of the tenants' counsel, that some of the lines, marked to suit the calls of the said surveys, appeared to be younger; and others, from their appearance, might be as old as the date of the said plats. The demandants, to counteract this evidence, and to sustain their claim, offered in evidence a survey, made out by M'Neal in an action of ejectment formerly depending between the same parties for the same land, of which survey Pearl had due notice. The tenants objected to the reading of the explanatory report accompanying this survey, and the court refused to allow so much thereof as stated the appearance as to age and otherwise of the lines and corners to go in evidence to the jury; and accordingly caused to be erased from the plat the words following, viz. "ancient" (chops);—"John Forbes, Jun. states he cut the same letters and figures;"—"on the east side, no chops appear to have been marked with a larger axe, than the chops on the beginning tree;"—and then permitted the residue of the report and plat to go in evidence. Held, that the evidence was properly refused.

The assumption that there can be no possession to defeat an adverse title, except in one or other of these ways, that is, by an actual residence, or an actual enclosure; is a doctrine wholly irreconcileable with principle and authority. Nothing can be more clear, than that a fence is not indispensable to constitute possession of a tract of land. The erection of a fence is nothing more than an act presumptive of an intention to assert an ownership and possession over the property. But there are many other acts, which are equally evincive of such an intention of asserting such

[Ellicott v. Pearl.]

ownership and possession; such as entering upon land and making improvements thereon; raising a crop of corn; felling and selling the trees thereon, under colour of title.

An entry into possession of a tract of land, under a deed containing specific metes and bounds, gives a constructive possession of the whole tract, if not in any adverse possession: although there may be no fence or enclosure round the ambit of the tract, and an actual residence only on a part of it.. To constitute actual possession, it is not necessary that there should be any fence or enclosure of the land.

Where there has been an entry on land under colour of title by deed, the possession is deemed to extend to the bounds of that deed; although the actual settlement and improvements were on a small parcel only of the tract. In such a case, where there is no adverse possession, the law construes the entry to be co-extensive with the grant to the party; upon the ground that it is his clear intention to assert such possession.

The demandants, in a writ of right, claimed adversely to all the tenants, upon a title independent and distinct from theirs. The tenants all claimed under an adverse title by deed of seven thousand acres; that is, under a title common to them all. The demandants could not recover any tract in controversy, unless they were seised thereof within thirty years, the period prescribed by the statute of limitations for writs of right. If, therefore, there had been thirty years adverse possession of the particular tract in controversy, by any of the tenants; the demandants failed in their suit, and were debarred from any recovery.

The court instructed the jury, that if they should find that the patent for the land, under which the title of the tenants was derived, did not cover all the land; yet, if they find from the evidence, that the tenants, or any of them, or those claiming under them, have had possession of the land in contest for thirty years next before the commencement of the demandants' suit, they must find for the tenants.

IN error to the circuit court of the United States, for the district of Kentucky.

The plaintiffs in error, citizens of the state of Maryland, on the 17th day of January 1831, sued out of the circuit court of the United States for the district of Kentucky, a writ of right against William Pearl, for a tenement containing one thousand acres of land, in the county of Laurel, in the state of Kentucky. The defendant appeared and took defence, and put himself on the assize; praying recognition to be made, whether he had greater right to hold the said tenement, with the appurtenances, as he held it; or whether the demandants, Ellicott and Meredith, to have it, as they demanded it. The demandants afterwards did likewise.

At May term 1834, the case was tried by a jury, who returned into court the following verdict: "We, the jury, find that the tenant has more right to have the tenement, as he now holds it, than the demandants to have it:" and the circuit court gave judgment for the tenant accordingly.

[Ellicott v. Pearl.]

At the same term of May 1831, other writs of right were sued out by the plaintiffs against other tenants of the land ; and the like proceedings and judgment took place.

On the trial of the case, the following bill of exceptions was filed.

The parties having agreed that these causes should be heard at the same time, without prejudice to the right of either party, and that the evidence should be heard as to all, and to be applied to each respectively, the jury was so sworn; and the plaintiff, to support his part of the issue, introduced the patents to James Kincaid for two thousand acres, and for one thousand acres, and deed from James Kincaid to Samuel and Robert Smith, and the deed from Robert Smith to Samuel Smith, and the deed from Samuel Smith to the demandants, in the words and figures following. [The patents and deeds were inserted.]

The boundaries of the two thousand acres, surveyed and granted to James Kincaid, were "in Lincoln county, on the east fork of Rockcastle, beginning at Kincaid's lick, on a branch of said fork, and on the north side, thence south and east for quantity, and bounded as followeth, to wit: beginning at said Kincaid's lick, on a branch on the north side of the east fork of Rockcastle two beeches, thence south five hundred and sixty-six poles, crossing said fork to two white oaks, thence east five hundred and sixty-five and a half poles, crossing several branches to a white and black oak, thence north five hundred and sixty-six poles, crossing said east fork to two black oaks, thence west five hundred and sixty-five and a half poles, to the beginning."

The boundaries of the one thousand acre survey were, "in Lincoln county, on the waters of Rockcastle, to begin at Grigsby's southeast corner of his entry of two thousand acres of land, thence west with Grigsby's line to his corner, thence south for quantity, and bounded as followeth, to wit.: beginning on said Nathaniel Grigsby's south-east corner at a white oak and black oak, thence west five hundred and sixty-five and a half poles, crossing several branches with said Grigsby's line to his corner at two white oaks, thence south two hundred and eighty-three poles, to two black oaks, thence east five hundred and sixty-five and a half poles, crossing some branches to two chestnut oaks, thence north two hundred and eighty-three poles, to the beginning, with its appurtenances."

The parties also agreed that the trial of each and all the cases should be had on the merits, as though there were no blanks in the

pleas, and that neither party should take advantage of any defect in the pleadings.

The demandants also read the surveys of M'Neal, the one made out in this case, and the one made out in the action of ejectment lately depending before this court between the same parties, which surveys are made part of this bill of exceptions, by reference, and also introduced the said M'Neal, who stated on oath, that he was at the place shown on the plat as the beginning corner of Kincaid's two thousand acre survey ; that the trees stood in an island of Pond creek, and that the letters W. H were made on each of the large trees, and on one of them, the letters I. K. were also marked ; that he run the line running south from that point, and observed two sets of marks, the one appearing old, and the other not so old as Kincaid's survey ; that the old line trees appeared about as old as the corner trees and the letters, but that either was as old as the surveys of Kincaid, he could not say ; that all he could say was, that himself and others thought corner trees and the old marks on the line, were made at the same time; that he had cut out a block on the line, it appeared to count for an old line, but it had grown so close that he could not count the annulations. The witnesses stated that in running the south line, he had crossed Rockcastle three times before he reached the corner, pursuing the course of the patent in the manner represented in the connected plat in this cause, and that the plat correctly represents Rockcastle river, where it is crossed by the several lines of Kincaid's two thousand, as run by him and laid down in the plat aforesaid. The plat made out in the action of ejectment, and which was read in evidence, as aforesaid, was objected to as incompetent evidence in this cause, by the defendants, but the objection overruled. M'Neal also stated, that in the plat made out in the ejectment case, Rockcastle river, except where it was crossed by the first line from the place shown him in the beginning, was laid down by protraction only, but he had actually surveyed and laid correctly the crossing of the river, by the different lines on the connected plat, in these causes; each of the demandants admitted that he resided, at the commencement of these actions, at the place represented as his residence on the plat, and surveyor's report made in these causes, and that if the beginning corner of the patent of James Kincaid, was at the point claimed by the demandants, the lands they respectively so hold, and claimed, were within the patent and deeds read in evidence by the demandants.

The defendants then introduced the patent to Jacob Remey, and Jacob Remey's deed to William Edwards, and William Edwards's deed to the defendant, William Pearl, as follows [The patents were here introduced]. The patent was dated the 15th of July 1789, and the land was described, as a "certain tract or parcel of land containing twenty-nine thousand acres by survey, bearing date the 7th day of November 1785, lying and being in the county of Lincoln, on the waters of Rockcastle, and bounded as followeth, to wit, beginning three-quarters of a mile south of the mouth of Raccoon creek, and about ten poles from the same on the west side at two white oak trees; thence north two thousand four hundred and sixteen poles to a hickory and black oak trees; thence west one thousand nine hundred and twenty and a half poles to a white oak and black oak trees; thence south two thousand four hundred and sixteen poles to a white oak; thence east one thousand nine hundred and twenty and a half poles to the beginning, with its appurtenances."

They then proved by the said M'Neal, that the deeds aforesaid of Remey to Edwards, and from Edwards to Pearl, include the land in contest, and are correctly represented on the connected plat; that he had followed an old marked line from the mouth of Raccoon creek, running north, and out of which he cut two blocks, which he thought counted to the date of Remey's survey.

That he had lived in the part of the country where the land in contest lies, upwards of thirty years, and had always known Rockcastle river, and Raccoon creek, and Pond creek by their respective names, since ever he had been acquainted in that part of the country; that he was on part of the lines of Pearl's deed, in 1799, before Pearl settled on the land, and that in the spring of 1800, William Pearl, claiming the whole of the land described in his deed under the patent to Remey, settled upon the land, as he understood, intending to take possession of his entire tract; and that Pearl, and those claiming under him, have held the possession of the land ever since, that the settlement of Pearl aforesaid, was made at or near the figures II, on the connected plat. That Pearl and those claiming under him, have always claimed to hold the land under Remey's patent; the other defendants all claimed under Pearl. The defendant also introduced John Crook, who swore that he was at the house of William Pearl in the spring of the year 1800, and that he was then living on Rockcastle, near the place represented on the plat made

[Ellicott v. Pearl.]

out in this cause by the figures II; that he came from the neighbourhood of Goose creek, or by Terrell's camp; and that Terrell's camp was about four miles from Pearl's, rather east, and Pearl's was all the settlement he then knew of in that part of the country. He was not at that time at the place represented on the plat as the house where James M'Cammon lived in 1801, nor could he say whether M'Cammon was then living there or not, that place is several miles distant from the place at which William Pearl then lived.

The defendant called Metcalfe, who stated that old James M'Cammon moved his family and settled on the land in controversy at the place represented as the house where James M'Cammon lived in 1801 on said plat, either in 1800 or 1801, and he thought 1800; and as he understood, under a purchase of a part of his land from William Pearl, but how much he did not know, nor could he say. He understood that M'Cammon had contracted with Pearl for part of his land, and settled under that contract, and continued to hold the land aforesaid for a year or two, when, by some arrangement or agreement between M'Cammon and Pearl, he, M'Cammon, got other land, part of Pearl's same tract, and Pearl took the place aforesaid; that the place first settled by M'Cammon had been ever since held and possessed by M'Cammon, Pearl and others holding under him; he could not say whether his land was marked out to him or not; but he said he never heard it was, nor did he ever hear that any deed was made: he also said, upon being interrogated by demandant's counsel, that one Hardy Hart settled under a contract of purchase from Remey, about the same time, he thought, at or near the same place; that he could not say what year it was; he said that he could not speak positively of the year M'Cammon first settled, but it was the same year one of his children was born; and he always thought it was on the same year his daughter Jenny was born until he came here, but she being of the same age that a brother of M'Neal the surveyor was, and M'Neal's brother being, as he was then told by M'Neal, thirty-one years old next July, he had, on reflecting upon the subject, become satisfied that it was his daughter who he thought was about two years older than Jenny that was born about the same time that M'Cammon settled as aforesaid, so that he had concluded that M'Cammon had settled either 1800 or 1801; and that he thought that he and Pearl settled about the

[Ellicott v. Pearl.]

same time ; and that the land has been settled and held by one or another under Pearl's claim ever since.

M'Neal was then called, and stated that he could not state when M'Cammon settled ; that all he could state was that his, M'Cammon's boys, were there making the improvements for their father the fall before he, M'Cammon, brought his family and settled, as witness had in the spring of the year assisted them to roll logs, at which time the old man had not removed to the place, from which he inferred that they had been there the winter before ; but could not say when they did first go on the land, nor could he state what year he rolled the logs ; that Pearl settled near the figures II as stated on his plat in the spring of the year 1800 ; that he, Pearl, that year made sugar and tapped trees within the one thousand acres of the demandants as laid down ; but his house and clearings did not interfere with the one thousand acres ; that his brother, that was of the same age of Jenny the daughter of the witness, would be thirty-one in next July ; that he understood that Pearl settled at the figures II claiming under his purchase of Edwards his whole tract ; he was asked by demandants' counsel, whether Pearl did not tell him that M'Cammon settled in 1801, and in answer he said that at the direction of Pearl he had represented the place on the plat to be the one at which M'Cammon lived in 1801.

The demandants then examined John Cook, who stated that he was acquainted with Hardy Hart, spoken of by the witness Metcalfe, and that he resided on Goose creek below the salt works in the month of July 1802. That he and the company arrived at the salt works on the 2d of July 1802 ; that the said Hardy Hart was then living below the Goose creek salt works, on Goose creek, on the south fork of Kentucky ; that after he arrived at the salt works, he, and his company, purchased corn of him, the said Hardy Hart, for their wagon horses ; that he continued to reside there some time afterwards, how long he could not say, but he thought until fall, when he removed to Rockcastle, and settled near to William Pearl's.

The demandants, to show that Remey's patent did not cover their patents, but that it covered land at or near the mouth of Pond creek, read the deposition of James Kincaid, and which is made a part of this bill of exceptions.

[The deposition of James Kincaid stated in substance, that he received Thompson's warrant from Allen, and bound himself to locate and make the survey. He received Remey's warrant from

Nathaniel Grigsby.　He was never at the mouth of Raccoon creek, until he went there in company with George Thompson, between 1796 and 1799.　Before he made the survey, he did not particularly understand the geography of the country.　He went from the Crab orchard ; and we went what was called the Crab orchard trace ; but we did not travel the trace as far as the Hazelpatch.　He had travelled the trace before, and he thought he could go a nearer way to Raccoon creek through the woods.　He was apprised of the place where the trace crossed Raccoon creek ; and when we got in the flat near the Hazelpatch we turned off to the left hand to strike the mouth of Raccoon creek ; and after travelling some distance we struck a water course, supposed by me to be Raccoon creek ; and he went down it to the mouth, or to where it and another creek came together ; and we supposed that was the mouth of Raccoon creek.

George Wilson, Reuben Terrell, William Moore and a young man by the name of Myres were there ; and he don't remember others, but he thinks there was another man by the name of Crow.

The following was the manner of making the survey : we went there in the evening late, and encamped on a little dry branch above the mouth of the creek on the south side ; recollects the next morning he saw spruce pines standing on the bank, both above and below the mouth of the creek.　Did not recollect of going to the mouth of the creek ; but took it for granted, from the appearance of the bottom on the north side of the river, that it must be the mouth of Raccoon creek.　And next morning after we got there, he thinks he went down to the bluff, near the mouth of the creek ; and George Wilson, who was a young man that he was learning to survey ; he had a compass, and he started to run the north line ; and myself and Reuben Terrell and William Moore, started and run the three quarters of a mile south to the beginning corner ; but he did not think he marked the beginning corner that day, for we had but one tomahawk in the company, and George Wilson had taken that on the north line. But after measuring three quarters of a mile from the mouth of the creek, we then stopped and started to run the west line of Thompson's and Remey's surveys ; this line he marked " thirdly," with a butcher knife, and made Thompson's corner and Remey's with said knife, and returned to the camp the same evening, near the mouth of the creek, and there he met with George Wilson ; and he furnished him with his field notes of the north line of Remey's survey, and we all went in company to the beginning, that he had ascer-

tained the day before, and then made beginning corner with a toma-hawk. We then started and run the south line of Thompson's survey to the trace which was called Boone's trace, crossing it near the top of a ridge dividing the waters of Little and Big Raccoon ; that is what he now understands to be the waters of Big and Little Raccoon. Where he crossed the trace he was more particular, and marked the line more plain, and continued the line the length of the survey, and made the corner.

He recollected to have run over a ridge from the mouth of the creek to the beginning, and rose a steep hill ; and after running the distance called for, made Thompson's corner, and continued the line to Remey's corner. Never has been at Remey's corner since. Described the trees at the corner. He did not think he crossed the creek in running the south line of Thompson's survey. The survey was thought to be at Raccoon creek, because it was intended to be there ; and it was thought to be there until it was discovered to be Pond creek, through mistake; instead of Raccoon creek.

He discovered the mistake when he went to the mouth of Raccoon creek in company with George Thompson and John Wood ; George Thompson and himself got John Wood to go and show us the nearest way to the mouth of Raccoon creek ; and when they got there, he told Thompson that was not the place he had made the survey; and Thompson replied and said that Wood said that was the mouth of Raccoon creek. And at that time he held Allen's bond for half of Thompson's survey, and Thompson was about buying his interest in the land ; and when he told him that was not the place he made the survey, Thompson told him he would give him a certain sum for his interest, provided he would then make the survey there, which he agreed to do ; and Thompson said if he would make the survey at that place, he would hold the land from the way the patent had issued, calling for the mouth of Raccoon creek; and that is the reason that in the obligation to Thompson that the waters of Raccoon is not named; but instead of Raccoon, the waters of Rockcastle was inserted ; for he told Thompson that he would not be responsible for the land at Raccoon creek ; and he knew the other expression could be complied with, for he knew the survey was made on Rockcastle.

John Kincaid and Jesse Shelton were present, when he marked the course on the west bank of Raccoon creek. He was not with Charles Smith when he made the survey at Pond creek. Neither William Pearl nor Moore was with them. He was sent for and

went to them, when they were near three miles from the course of the west bank. He did not tell William Smith where the beginning was, because Thompson had requested him not to do so. He has an interest in Remey's dam : and it would be worth more if the survey could be established at Raccoon creek.

Has, since the original survey was made, been well acquainted with both places, and has no doubt the survey was made at Pond creek. He described the mouth of Pond and Raccoon creek particularly ; and he stated that he well recollected to have seen them when the original survey was commenced.

On being asked what he knew about a survey in the name of Nathaniel Grigsby, of two thousand acres, lying on the north fork of Rockcastle creek, entered on the 10th day of March 1784, he answered :

"I made the entry, but had no knowledge of the place at that time but by information; but I employed William Henderson, a deputy surveyor, to make the survey as above, and the following, to wit : Thomas Shelton one thousand acres on a treasury warrant, No. 7746, as assignee of James Henderson, on the waters of Rockcastle, to begin at Grigsby's south-east corner of his entry of two thousand acres, as above entered the 3d day of August 1784. Also, Thomas Shelton seven hundred acres on a treasury warrant, No. 7747, beginning at the beginning corner of Grigsby's survey of two thousand acres; and it appears from record that Henderson did make the said surveys, because I did obtain patents for the same, and sold the same, with other lands, to the agents of Robert and Samuel Smith, but conveyed to the said Smiths by specialty, and acknowledged the same before the clerk of the court of appeals. Some time afterward a young man by the name of Curry, applied to me to show the surveys of the land I had conveyed to said Smiths : I referred him to said William Henderson, and I understood Henderson did show said Curry said lands : and I also understood, from a Mr Forbes, who was employed as chain carrier, that said Henderson, with said Curry, run around the said land and fresh marked the lines. Some time afterward my brother and myself went on to a certain lick on an east branch of Rockcastle, in order to bore for salt water : after working some time, and sinking down upwards of thirty feet, met with said Forbes, who then told us we were working within the lines of one of the surveys above described, wherein he had been employed chain carrier for the purpose of fresh marking. On receiving

this information we quit our work and went and examined the survey under the direction of said Forbes, and went to the beginning corner, it being two beeches, plainly marked; and it appeared to correspond with the patent and things called for therein, namely, the lick and the trees standing on the north side of the branch; and after examination we was so well satisfied that it was one of the aforesaid surveys, and that we were working within the lines of said survey, we abandoned our work entirely. And this deponent further sayeth that the two beeches described as the beginning of Nathaniel Grigsby's tract of two thousand acres, stand on a creek now known by the name of Pond creek, but an eastwardly branch of Rockcastle; and I think and believe that the survey of twenty-nine thousand acres of Jacob Remey, originally made, does not interfere with the aforesaid surveys from the aforesaid considerations; and this deponent further sayeth not."

The demandants also read to the jury the survey made out by Lott Pitman, which is also made a part of the bill of exceptions, by reference, and called said Pitman as a witness, who stated that he made out said plat, and that he found the objects as stated, and that the statement in the notes to said plat he believes to be substantially correct; that he had counted the blocks chopped out of the line running north from the mouth of Raccoon creek, that one, to wit, the one taken out the line nearest to the mouth of Raccoon creek, counted to the date of a survey made in 1786, and the one taken farthest off corresponded to a survey of 1785. That he had followed the marked line, running from the mouth of Raccoon creek to a corner, said to be Ballard Smith's corner; and that he found trees marked, as corner trees, corresponding with the call of Smith and Robert Rutherford's surveys. The plaintiff then read to him the surveys of Robert Rutherford, Ballard Smith, and asked him if the old line did not correspond to these surveys: he answered it did, and that date of Robert Rutherford's survey corresponded with the first block, and that of Smith's to that of the second shown by M'Neal.

That the distance stated by M'Neal to the mouth of Raccoon, where he cut out the first block, would, he thought, be in the line of Rutherford, and where he said he cut out the second block, would be in the line of Smith; he thought said witness stated that he had done much surveying in that part of the country; had much experience in tracing old lines, and in counting the annulations of marked

lines: and that he knew of no survey in that part of the country of the dates of 1785 or 1786, except the surveys of Rutherford, Ballard, Smith and Remey, that he had long known the line leading north, spoken of by the witness M'Neal, and had always heard it called Rutherford's line to his corner, and then Smith's line.

That Rutherford's land was settled, and those claiming under him claimed that line as one of his boundaries; said witness stated that he began at the mouth of Pond creek, and run a south line to the place shown where a white oak corner stood, and shown by Camp Mullins and others, and then run a west line for the dividing line between Thompson and Remey, and pursuing the line for some distance, he saw ancient marks, apparently made with a knife, that after he run some distance his compass left it, but, finding the line again, he pursued it until they crossed Boon's old trace; near to the trace, on both sides, he found the line marked more thickly; that the marked line, thus found, when reversed, would lead to about where Mullins showed the place for the corner; that the line run as aforesaid was not a west line, but was run on a variation of nine degrees from the call in the patent; that the ordinary variation of lines made, when Remey's purports to have been made, is about three degrees.

The demandants then called Camp Mullins, who stated that, a good many years ago, about twenty-four or twenty-five, he was taken to the mouth of Pond creek to search for Remey's survey, with Charles Smith, the surveyor, Davis Caldwell, and ——— Moore; said Moore said he was one of the original chainmen; that they started at the mouth of Pond creek, and run south until the surveyor told them the distance called in Remey's patent was out; and they then turned out to hunt for the corner; that he found a white-oak standing near to where the course and distance ended, plainly and anciently marked as a corner-tree. That he recollected it was marked on the north and west sides, but could not say whether it was marked on the south side or not; that the white oak was of a common cabin log, and that near to the tree lay the trunk of a white oak not quite so large; that the top of the log was burnt so that no chops appeared on it, but that they turned it over, and found the under side plainly and anciently marked with three chops, apparently done with the same tool that the standing tree had been marked with; that they then run north, and on the course of Remey's patent, saw line trees plainly marked, that appeared old, and to have been made about the same time, and the same kind of tool that the white oak corner did; and

that they run the west line and saw marks made with a knife, draw-ing-knife of some kind; that he showed the place where said trees were, to Lot Pitman and M'Neal, but that said tree and log are now gone, and a hole or hollow place is visible yet, where he thinks the white oak stood. ' That Moore, the chainman to Remey's original survey, is now dead.

That on the lines aforesaid there were many trees plainly marked, and might be easily discovered by any person pursuing the courses, and also called Mullins, who stated that he was along with his bro-ther Camp Mullins and others, when the the white oak tree was found, and stated the same that Camp Mullins did as to the tree log and lines.

The demandants then called Henderson, who stated that he had been on the ground and shown the place spoken of by Mullins; that he had accompanied the surveyor when running north from said tree: that they saw no line trees now standing, but he saw several trees standing near where the survey run, blazed ; that his object in going on the ground (he being agent of demandants) was to find marked trees on the lines aforesaid, but after the most diligent search, neither he nor any other in company, could find any marked trees; that there were standing in the course of the line many trees. Pitman the surveyor made the same statement.

The defendant then called John Crook, who stated that about 1801, he had been called on as deputy surveyor by James Kincaid, whose deposition demandants had read, to lay off Jacob Remey's survey, in which said James Kincaid claimed an interest; that he was taken to the place now claimed by defendants to be Remey's beginning corner, three quarters of a mile south of the mouth of Raccoon creek, and shown by said Kincaid a white oak tree, or two white oak trees as corners, and told by said Kincaid that he had made the survey of Remey there; that he was directed by Kincaid to run the diagonal line from that to the north-west corner, to see if the survey would include a famous saltpetre cave then esteemed of great value, claimed by said Kincaid under said patent of Remey; that he ran the line to a tree which Kincaid showed as a corner tree; that tree was newly marked and not chopped through the rough bark; and if it were in reality a corner and the beginning also, the survey would include nearly forty thousand acres of surplus land; that in making the survey aforesaid he acted under an order of court in a suit in which Kincaid, the witness for demandants, was party or in-

interested; that Kincaid was interested in making Remey's patent cover the saltpetre cave, and that if Remey's survey was originally made at Pond creek, his patent boundary would approximate the saltpetre cave, three or four miles nearer than if the survey had been made to begin where Kincaid then showed the beginning to him.

The defendant also called William Smith, who stated in substance what Cook stated, and further stated that Kincaid said that he would make new lines look like old ones, by putting aquafortis in the chops, and he stated that the chops on the white oak corner appeared to be too old for 1798, but he could not state how old it was; they were not doubting that it was shown as the corner by Kincaid that it was so; did not count the annulations, and was then but little accustomed to pursuing and hunting old lines; said witness stated that when they run the diagonal line as stated by Crook, to the northwest corner, he felt satisfied that the survey to run from Raccoon could not reach the saltpetre cave; that to include the cave seemed to be a principal object with Kincaid; that it was then a bone of contention between Kincaid and others, and he himself was interested in defeating Kincaid in his attempt to include the cave by Remey's survey; that the cave was then considered of great value by all; that Kincaid had then got into possession of it, and was working it under Remey's patent; said witness further stated, as did the witness Cook, that to begin Remey's survey at the mouth of Pond creek, where Kincaid placed it in his deposition, would place it several miles nearer to the saltpetre cave; he thought at least three or four miles nearer, and the same fact was proved by other witnesses.

Smith and Crook both stated that the trees shown as aforesaid, by Kincaid, as Remey's beginning, were marked as corner trees, such as are called for in Remey's patent; that the marks had an ancient appearance; as they were convinced it was the beginning corner, they could not pretend to judge from the appearance of the marks, the exact time the marks were made, but they were confident they must have been made many years before 1798.

The defendants then called Titus Mershon, who stated that at times he could not state, but thought several years since 1801, or the time spoken of by Crook and Smith; that Kincaid, the witness, told him that in the division of Remey's survey, he, Kincaid, had got the north end and worst land, and desired the witness to let Pearl know, that if he did not consent to a division, that he would prove the survey at the mouth of Pond creek; that he could prove

[Ellicott v. Pearl.]

it at either place, for he had made a survey of it, both at the mouth of Pond creek, and at the mouth of Raccoon creek ; that at another time, and subsequent to the conversation first detailed, Kincaid offered to him to buy state warrants in the name of the witness, and lay them upon Pearl's land or Remey's survey, and that he would prove Remey's survey at the mouth of Pond creek ; and that he, Kincaid, and the witness, Mershon, would divide the land between them ; that no one was present at these conversations ; the witness said that he rejected the proposition of Kincaid, and Kincaid said if he would not others would. He, the witness, said that Kincaid went on to remark to him, that when he made the survey at Raccoon creek, his brother-in-law, Wilson, was in company, and he, Kincaid, informed the witness how it happened, that the corner three-quarters of a mile from the mouth of Raccoon creek had not been made on a true south course, and why the line had not been properly marked ; he said the ground, or some of it, was so they could not run over it, and they took offsets and lost their reckoning ; and Kincaid said that when they so run from the mouth of Raccoon to the beginning corner, some of the company went on one side of the creek, and some on the other ; the witnesses all concurred in proving that ever since Pearl settled in 1801, he and those holding under him, have claimed the land in contest, under the patent of Remey. The demandants then called Lot Pitman, who stated that from about the place spoken of by Crook and Smith, and shown to them as the place of beginning for Remey and Thompson's survey, and where they saw a white oak corner, he had run a west line the distance called for in Thompson's patent, at the end of which he found corner trees standing, marked to correspond with Thompson's patent ; that he had cut or seen cut out of the said line several blocks ; the annulations of which counted back to 1798. Said witness stated, that to begin at Pond creek and run south the distance called for in Remey's patent, to the place shown by Mullins, where the white oak corner stood, the line did not cross Rockcastle and land on the west side of that stream ; that Rockcastle, at its junction with Pond creek, was narrow, and Pond creek appeared wide, but that Rockcastle run, he thought, double the water that Pond creek did ; said witness also stated, as did M'Neal, that to run the course of Remey's patent south from the mouth of Raccoon creek, the distance called for, crossed Raccoon creek three times, and ended on the east side of the creek, and about fifty poles from the place stated by Smith and

[Ellicott v. Pearl.]

Crook, as shown by Kincaid in 1801, for the beginning corner of Remey and Thompson's surveys; said witness stated, and so did M'Neal, that these two streams emptied into the east fork of Rockcastle river, called Raccoon, the one called Big Raccoon and the other Little Raccoon; that the stream where Pearl claimed the survey to be, was called Big Raccoon creek; that Little Raccoon empties into Rockcastle, about two miles below Big Raccoon. The defendants then called Camp Mullins, who stated, that the white oak corner at the mouth of Pond creek, of which he had spoken, and the line running north from it, appeared to be marked with a tomahawk, and also ―――― Mullins, his brother, who stated the same.

The foregoing being the substance of the evidence given on both sides, the plaintiffs offered to prove, by witnesses, that William Moore, whose name is put down as one of the original chain carriers in making Remey's survey, was dead, and that he attended the witness, Camp Mullins, about twenty-four or twenty-five years ago, when Charles Smith run from the mouth of Pond creek to the white oak tree, and also run the line north running from the mouth of Pond creek, and that while at the corner and running the line, he declared that to be the corner made by Kincaid and the line run by Wilson by the direction of Kincaid for Remey's original survey, and also to prove what said decedent, chainman, had stated to others relative to the boundary of Remey's patent, and the making of the original survey, since the settlement and possession of Pearl on the land in controversy. To the giving the statement and declarations of said chain carrier, though proven to be dead, while at the corner and on the line, or at any other time or place since the survey was made, the defendant objected as incompetent evidence for any purpose in this cause, and his objection was sustained by the court, and the declaration of the deceased chain carrier was not permitted to be given in evidence. To the which opinion of the court, in refusing the evidence or any part of it, the demandants excepted, and prayed the court to sign and seal this their bill of exceptions. (No. 1.)

*Memorandum.*—After the defendant had given in evidence the conversations and declarations of James Kincaid, with the witnesses, Mershon, Smith, and others, with a view to discredit it, Kincaid, and to show that he had stated that survey was made by him at the mouth of Raccoon for Remey when it was his interest to place it at Pond creek, as it might then with less surplus include the saltpetre cave. The demandants, with a view to sustain Kincaid, and to

[Ellicott v. Pearl.]

report the statements going to show his interest, offered witnesses to prove the statements and conversations of Kincaid, and corresponding with the statements made in his deposition, relative to his making the surveys of Thompson and Remey: to the giving such statements and conversations in evidence for the purpose aforesaid, or any other, the defendants objected; upon which the court inquired of the counsel for the demandants, whether the statements of Kincaid, which he proposed to give in evidence, were made prior or subsequent to the time when the statements to the contrary were made by him, as given in evidence by the tenants: to which he answered he did not know, but he supposed subsequent; and thereupon the objection was sustained by the court, and the evidence excluded; to which opinion of the court the demandants except and pray, &c. (No. 2.)

The defendant, to prove the boundaries of the demandants, as laid down on the plat and claimed by them, give in evidence the original plats and certificates of surveys of James Kincaid's two thousand and one thousand acres surveys, and then examined demandants' witness, M'Neal, the same person first introduced by them to prove their boundary, who stated that the water courses, as found on the ground, did not correspond with those represented in said plats; and after being examined by demandants' counsel, for the purpose of proving that the marks on the trees claimed by them as the corner and lines of their surveys were as ancient as said surveys; and also as to the position and otherwise of the lines and corners claimed by them, and represented on the plat made in this cause and used before on this trial, stated on the cross-examination of the defendants' counsel, that some of the lines trees marked to suit the calls of said surveys, appeared to be younger, and others, from their appearance, might be as old as the date of said plats; and the plaintiff to counteract this evidence, and to sustain his claim, offered in evidence the following survey made out by M'Neal, in an action of ejectment formerly depending between the same parties, and for the same land in this court, which he obtained from the papers in that cause in the progress of this trial; demandants proved that the tenant Pearl had notice of the time of the making said survey. To the reading of which report for the purpose aforesaid or for any other in evidence in this cause, the defendant objected, and the court refused so much of said report as stated the appearance as to age and otherwise of the lines and corners, &c., to go in evidence to jury, and caused to be

erased from the plat the following words [here words erased or underscored were inserted], and permitted the balance of the report and plat to go in evidence. To which opinion of the court in refusing the remarks, and notes of the surveyor, M'Neal, to be given in evidence as aforesaid, the demandants except, and pray the court to si, n, &c. this their bill of exceptions. (No. 3.)

The evidence being closed, the demandants moved the court to instruct the jury, that if they believe, from the evidence, that the survey of Jacob Remey, and the adjoining survey of George Thompson, was in point of fact made at the mouth of Pond creek, by beginning at or near the letter L on the plat, that the law locates the patent on the ground where it was actually surveyed, notwithstanding the call or reference in said patents, or of either of them, to the mouth of Raccoon creek; and if they find that the patent of Remey, as surveyed, does not interfere with the claim of the plaintiffs, that they ought to find for the plaintiff, unless they find that defendants have had possession by an actual residence or fence, within the patent of plaintiffs, thirty years or more next before the bringing of these.

This instruction the court overruled as moved, but struck out the word *fence* and inserted in the stead thereof, the words "improvements with the intention of taking possession."

The instruction, so amended, was given to the jury, and the jury were also informed by the court, that the tapping or cutting the sugar trees for the purpose of making sugar, and so using them, and the land, would not avail the tenant under the act of limitations. The demandants further moved the court to instruct the jury as follows: 2d. To instruct the jury that the settlement of William Pearl at or near the II, as designated on the plat in 1800, outside of the patents under which the demandants claim, does not give any defence or limitation to the demandants' right to recover, though he settled within what he supposed to be Remey's claim, unless they find that Remey's survey, as actually made, and on which his patent issued, includes said settlement and the patent under which demandants claim. 3d. That unless they find that Remey's survey covers the patents under which the plaintiffs claim, that the settlement of M'Cammon within the two thousand does not give a claim to a possession within the one thousand acre patent: nor does the possession within the one thousand acre patent give any possession within the two thousand acres.

That as to the two thousand acres the statute runs as to that from

the time a possession was taken by an actual residence or by fencing, and the same as to the one thousand; consequently that if they find that one has been thus possessed adversely for thirty years next before the bringing of this suit, and the other not; that as to the other not so held, they should find against such defendants as were within such patent at the date of the demandants' writ, provided, these settlements are not included in Remey or Thompson's as originally surveyed.

4th. To instruct the jury that if they find from the evidence that James Kincaid, the surveyor of Remey and Thompson did in point of fact make the surveys of Remey and Thompson, or cause them to be made, and the patents issued thereon, beginning at or near the mouth of Pond creek, as designated on the connected plat, and that after he returned the certificate of survey and patents issued thereon, marked or caused to be marked, surveys with lines or corners to correspond with the calls of the patents at Raccoon creek, that such marking or surveying is utterly void and vests no title whatever in Remey, or his alienee, notwithstanding such surveys or marking may include the land in contest.

5th. That if they find Kincaid's beginning corner to be as represented on the plat, that then, as to this controversy, his surveys are properly laid down.

The court overruled the instructions, number three, but give the other three instructions.

To which decisions of the court in refusing to give to the jury the demandants' instruction, No. 1, as moved; and in refusing to give to the jury their instructions, No. 3; the demandants by their counsel excepted, at the time of the decisions, and now prayed that their bill of exceptions might be signed, sealed and enrolled, &c.

After the demandants had moved for the instructions stated in their fourth bill of exceptions, the defendant moved the following instructions.

1. That to enable the demandants to recover, they must have proved, to the satisfaction of the jury, that they, or those under whom they claim, have had seisin of the land in contest within thirty years next before the commencement of their suits.

2. That if they find, from the evidence, that Remey's patent includes the land in contest, they must find for the tenants.

3. That if they find, from the evidence, that Remey's patent does

not cover the land in contest, yet if they find, from the evidence, that the tenants, or any of them, or those claiming under them, or any of them, have had possession of the land in contest for thirty years next before the commencement of the demandants' suits, they must find for the tenants.

4. That the plat and certificate of survey of Nathaniel Grigsby, upon which the patent for two thousand acres issued, is evidence, though not conclusive, of the objects noted by the surveyor, which the court gave, except the first instruction moved for by defendants, to which opinion of the court, in giving the second, third, fourth, fifth and sixth instructions, moved by the defendant as aforesaid, the demandants excepted, &c.

The demandants prosecuted this writ of error.

The case was argued by Mr Underwood, and by Mr Hardin, for the plaintiffs in error. No counsel appeared for the defendant.

Mr Justice Story delivered the opinion of the court.

This is a writ of error to the judgment of the circuit court for the district of Kentucky, upon a writ of right, sued forth on the 17th of January 1831; in which the plaintiffs in error were the demandants. The proceedings are in the form prescribed by the statute of Kentucky; and the cause was tried upon the issue joined by the parties. There were several writs of right against other tenants of distinct parcels of the same tract of land, held by the tenants, respectively, under a common title; and all of them were tried at the same time, by consent of the parties; as the same evidence was applicable to each.

The demandants claimed title through intermediate conveyances to a tract of land of two thousand acres, lying on the east fork of Rockcastle, in Lincoln county, under a patent granted to James Kincaid, by the commonwealth of Kentucky, dated the 2d day of February 1796; and also another tract of land, containing one thousand acres, on the waters of Rockcastle, on the south side and contiguous to that of two thousand, on a like patent, dated on the same day.

The tenants claimed title to the premises under a patent from the commonwealth of Virginia, to Jacob Remey, of twenty thousand acres of land, lying on the waters of Rockcastle, dated on the 15th of July 1789. Remey, on the 20th of November 1799, conveyed thirteen thousand four hundred acres of the same tract to William Edwards:

and Edwards, on the 26th of December 1799, conveyed seven thousand acres of the same tract, by metes and bounds, to William Pearl, the tenant, under whom all the other tenants claim. The conveyance to Pearl comprehends all the land in controversy ; and the same land is also included in the patents to Kincaid.

At the trial, evidence was introduced by the tenants to prove that, in 1800, Pearl entered into and settled on the tract of land so conveyed to him, intending to take possession of the whole tract ; and that he, and those claiming under him, have had possession of the same land ever since, and have always claimed to hold the land under Remey's patent.　Evidence was also introduced to prove, that James M'Cammon (whose name is mentioned, as we shall hereafter see, in the bill of exceptions), moved his family and settled on a part of the land in controversy, either in the year 1800 or 1801, under a purchase from Pearl ; but how much land he purchased or held did not appear : and about two years afterwards, by some arrangements between them, M'Cammon took some other part of Pearl's land, in the same tract, and Pearl took the place where M'Cammon had settled. Pearl's original settlement was a little outside of the southern bounds of Kincaid's thousand acre tract ; between Sugar Camp branch and Rockcastle : and M'Cammon's original settlement was within Kincaid's two thousand acres, south of Moore's creek.

The demandants then introduced evidence to show that Remey's patent did not cover the lands patented to Kincaid, but that it covered land at or near the mouth of Pond creek ; and that the survey of Remey was in fact made on Pond creek, (which was outside of the western boundary of Kincaid's patent), as the beginning corner, under a mistake that it was Raccoon creek.　If so made, it was clear, from the plea, that Remey's survey was surveyed off the land in · controversy.

The foregoing are all the portions of the evidence which seem necessary to be stated in order fully to understand the bearing of the questions made at the trial.

The first question was upon the admissibility of the evidence of witnesses, offered by the demandants, to prove that one Moore, whose name was put down as one of the original chain carriers, in making Remey's survey, was dead ; and that he attended with the witness, Camp Mullins, about twenty-four or twenty-five years ago, when one Charles Smith run from the mouth of Pond creek to the white oak tree, and also run the line north from the mouth of Pond creek :

and while at the corner and running the line, he declared that to be the corner made by Kincaid (the surveyor), and the line run by Wilson, by the direction of Kincaid, for Remey's original survey: and also to prove what Moore had said to others relative to the boundary of Remey's patent, and the making of the original survey, since the settlement and possession of Pearl on the land in controversy. This evidence being objected to, was rejected by the court: and this constitutes the matter of the first exception of the demandants.

We are of opinion that the evidence was properly rejected. It was not merely hearsay, but hearsay not to matters of general reputation, or common interest among many, but to specific parts, viz. the manner and place of running the boundary lines of Remey's patent. The general rule is, that evidence, to be admissible, should be given under the sanction of an oath, legally administered; and in a judicial proceeding, depending between the parties affected by it, or those who stand in privity of estate, or interest with them. So it was laid down by Lord Kenyon, in his able opinion in the King v. Enswell, 3 T. Rep. 721. Certain exceptions have, however, been allowed, which perhaps may be as old as the rule itself. But these exceptions stand upon peculiar grounds; and, as was remarked by Lord Ellenborough in Weeks v. Sparke, 1 M. & Selw. 686; the admission of hearing evidence, upon all occasions, whether in matters of public or private right, is somewhat of an anomaly. Hearsay is admitted in cases of pedigree; of prescriptive rights and customs; and some other cases of a public or quasi public nature. In cases of pedigree, it is admitted upon the ground of necessity, or the great difficulty, and sometimes the impossibility of proving remote facts of this sort by living witnesses. But in these cases it is only admitted, when the tradition comes from persons intimately connected, or in close relation with the family; or from sources of a kindred nature, which, in a general sense, may be said to import verity; there being no lis nota or other interest to affect the credit of their statement. So the law was expounded by Lord Kenyon in The King v. Enswell, 3 Term Rep. 723, and by Lord Eldon in Vowles v. Young, 13 Ves. 143, and in Whitlocke v. Baker, 13 Ves. 514.

In cases of prescriptive rights and customs, and other claims of a public nature, tradition and reputation have been in like manner admitted. They are all cases of a general right, affecting a number of persons, having a common interest. In Morehead v. Wood, 14 East's Rep. 329 (note), Lord Kenyon stated the general ground of

[Ellicot v. Pearl.]

this exception thus: "evidence of reputation upon general points is receivable, because all mankind being interested therein, it is natural to suppose, that they may be conversant with the subjects, and that they should discourse together about them, having all the same means of information." "But," he says, "how can this apply to private titles, either with regard to particular customs or private prescriptions? How is it possible for strangers to know any thing that concerns only their private titles?" Lord Ellenborough, in Weeks v. Sparke, 1 M. & Selw. 686, commenting on this distinction between public and private rights, said, "I confess myself at a loss fully to understand upon what principle, even in matters of public right, reputation was ever deemed admissible evidence. It is said, indeed, that upon questions of public right all are interested, and must be presumed conversant with them; and that is the distinction taken between public and private rights. But I must confess I have not been able to see the force of the principle, on which that distinction is founded, so clearly as others have done; though I must admit its existence." And in that case, which was the case of the claim of a prescriptive right to common by the defendants, as appurtenant to a messuage; evidence of reputation was admitted on the part of the plaintiff to qualify that right, because the right in some sense partook of the nature of a public right, as it was understood, that there were other persons standing in pari jure with the defendant; and, therefore, it was a question between the plaintiff, and a multitude of persons. And, indeed, the distinction seems now clearly established in England, that hearsay, or reputation, or tradition, is not admissible in cases of mere private rights; but only in cases of public rights, or those quasi publici, involving similar interests by a number of persons. (a) Perhaps a reason may be found which, upon general principles, would well support this distinction. It is, that in regard to private rights, the acts, possession and assertion of title by the parties claiming for themselves are, in all cases, susceptible of direct proof; but in cases of public rights, the acts, possession and assertion of title by many persons, not in privity with each other, cannot be explained or qualified to be in furtherance of a common public right; unless the evidence of general reputation were admissible to explain the intention and objects of the parties in those acts, or that possession or as-

(a) See Morehead v. Wood, 13 East's Rep. 327, note, 329; 1 Phillips on Evid. ch. 7, sect. 7, third ed. p. 190.; 1 Stark. Ev. 32, second London ed.; Doe v. Thomas, 14 East's Rep. 323; Freeman v. Phillips, 4 M. & Selw. 491.

sertion of title : that is to say, whether done in furtherance of a common right, or of a private right.

It is upon the ground of this same distinction, that general reputation is admitted in England in cases of disputed boundaries between parishes and manors : because the right affects many persons, and is of public notoriety and interest as to all the inhabitants of the parish or manor.(a) And yet, in England, it has been held, at nisi prius, (though the point has not been settled by the highest authority) that general reputation as to the boundaries between private estates is not admissible evidence. That was so held by Baron Graham, in Clothier v. Chapman ; cited in 14 East's Rep. 331, note.(b) The doctrine in America, in respect to boundaries, has gone further ; and has admitted evidence of general reputation as to boundaries between contiguous private estates ;(c) but there it has stopped.

These are the principal, if not the only classes of cases, in which hearsay and reputation have been deemed admissible evidence. The exclusion of it, in other cases, stands upon the general consideration that it is not upon oath ; that the party affected by it has no opportunity of cross-examination ; that it often supposes better evidence behind ; that it is peculiarly liable to be obtained by fraudulent contrivances ; and above all, that it is exceedingly infirm, unsatisfactory and intrinsically weak in its very nature and character. On these accounts judges in modern times have leaned against any extension of it, as being subversive of the security of the titles of parties to property : for upon a strict adherence to the rules of evidence that security must essentially depend. This will be clearly seen by what fell from the court in The King v. Enswell, 3 T. R. 707. In that case Mr Justice Buller, though in favour of the admission of the evidence upon the ground of authority, said : " the true line for courts to adhere to is, wherever evidence, not on oath, has been repeatedly received and sanctioned by judicial determinations, it shall be allowed ; but beyond that, the rule that no evidence shall be admitted but what is upon oath, shall be observed." The doctrine of the other judges, on that occassion, went to the same extent. In Doe v.

(a) Nichols v. Parker, cited 14 East's Rep. 331, note ; Paxton v. Dare, 10 B. & Cres. Rep. 17.

(b) See also 1 Stark. Ev. p. 33, 34, second London ed. ; Phillips on Ev. ch. 7, sect. 7, p. 189, 190, third ed. But see Barnes v. Mawson, 1 M. & Selw. 77, 81.

(c) See Caufman v. Presbyterian Congregation, 6 Binn. 59 ; Conn v. Penn, 1 Peters's C. Rep. 496, 511, 512. See also The King v. Enswell, 3 T. Rep. 719.

[Ellicott v. Pearl.]

Thomas, 14 East's Rep. 323, the court held, evidence of reputation, that the land had belonged to J. S. and was purchased of him by the first testator, though coupled with corroborative parol evidence that the same had belonged to J. S., was inadmissible; upon the ground that reputation was not admissible to prove the ownership of private property.(a) And Mr Chief Justice Mansfield, in delivering his opinion in the case of the Berkeley Peerage, (4 Campb. Rep. 414, 445), after stating that by the general rule of law, nothing said by any person can be used as evidence between contending parties unless it is delivered on oath, in the presence of those parties; said, " with two exceptions this is adhered to in all civil cases: first, on the trial of rights of common and other rights claimed by prescription : and secondly, on questions of pedigree." Perhaps this enumeration will, upon close examination, be found too narrow ; but it shows the strictness with which the exception in favour of hearsay tradition and reputation is constantly construed, as being against the general principles of evidence.

In this court a like restricted doctrine has been maintained. In Mima Queen v. Hepburn, 7 Cranch 290, Mr Chief Justice Marshall, in delivering the opinion of the court, said, "if other cases (of hearsay) standing on similar principles should arise, it may well be doubted, whether justice and the general policy of the law, would warrant the creation of new exceptions. The danger of admitting hearsay evidence, is sufficient to admonish courts of justice against lightly yielding to the introduction of fresh exceptions to an old and well established rule ; the value of which is felt and acknowledged by all."

These, and other cases also, fully justify the conclusion, (which is indeed stated by elementary writers) that in order to authorize the admission of hearsay evidence, (except in cases of pedigree) three things must generally concur : first, that the fact to which the reputation or tradition applies, must be of a public nature : secondly, if the reputation or tradition relate to the exercise of a right or privilege, it must be supported by acts of enjoyment or privilege within the period of living memory : thirdly, that it must not be reputation or traditionary declarations to a particular fact.(b)

(a) See Blarkett v. Lowes, 2 M. & Selw. 494.
(b) See 1 Starkie's Evidence 32, 35, second London edition ; 1 Phillips on Evidence, ch. 7, sec. 7, p. 178, 192 ; Morewood v. Wood, 14 East's Rep. 327, note.

This last qualification is most important in the present case, as it applies directly to it, and is established by clear and decisive authority. In Antram v. Wood, 5 Term Rep. 123, lord Kenyon said, "although a general right may be proved by traditionary evidence, yet a particular fact cannot :" and Mr Justice Groce (the only other judge then in court) concurred in that opinion. That was a case where hearsay evidence was offered to establish the identity of lands, and thereby a right to the coals in them; and it was held inadmissible. The same doctrine was recognized by lord Ellenborough, in Weeks v. Sparke, 1 M. & Selw. 687; where, referring to evidence of perambulations; he admitted that they were not evidence of a particular act done, as that such a turf was dug, or such a post put down in a particular spot. So Mr Chief Justice Mansfield, in his opinion on the Berkeley Peerage case, 4 Camp. Rep. 415, after alluding to the evidence of what dead men have said, as to the reputation of a right of way, common and the like, said, "a declaration, with regard to a particular fact, which would support or negative the right, is inadmissible." Even in cases nearly approaching to those of pedigree, where hearsay is admissible of particular facts, such as marriages, births and deaths, and their respective times; it has been held, that hearsay as to the place of birth, is not admissible; for it turns upon a single fact, that of locality, and that ought to be proved by the ordinary course of evidence. Rex v. Erith, 8 East's Rep. 539. In Mima Queen v. Hepburn, 7 Cranch 290, the court decided, that hearsay evidence was not admissible to prove a specific fact, although the witnesses to the fact were dead; and, therefore, evidence of hearsay that the ancestor of a person, suing for freedom, was free, was held inadmissible. The same point was again decided in Davis v. Wood, 1 Wheat. 6, 3 Cond. Rep. 465.

Upon these doctrines and authorities, we are of opinion, that the evidence in the present exception stated, was rightly rejected. It was evidence not to general reputation as to boundary; but to particular facts and circumstances attendant upon the original making of Remey's survey.

The next exception is founded upon the refusal of the court to permit testimony to be given of the declarations of one Kincaid (the surveyor of Remey's survey), under the following circumstances: Kincaid had been examined as a witness for the demandants, (by way of deposition) and the tenants, thereupon, gave in evidence the conversations and declarations of Kincaid, to certain witnesses, in order

to discredit his (Kincaid's) testimony, and to show that he had stated, that the survey was made by him, at the mouth of Raccoon creek, for Remey, when it was his interest to place it at Pond creek. The demandants then, with a view to sustain Kincaid, and to support the statements going to his interest, offered witnesses to prove the statements and conversations of Kincaid at other times, corresponding with the statements made in his deposition, relative to his making the surveys of Thompson and Remey; and it being suggested by the demandants, upon an inquiry from the court, that these statements and conversations were *subsequent* to those testified to by the tenants' witnesses; the court, upon an objection taken by the tenants, excluded the evidence. In our opinion, the evidence was rightly excluded.

Where witness proof has been offered against the testimony of a witness under oath, in order to impeach his veracity, establishing that he has given a different account at another time, we are of opinion that, in general, evidence is not admissible, in order to confirm his testimony, to prove that at other times he has given the same account as he has under oath; for it is but his mere declaration of the fact; and that is not evidence. His testimony under oath is better evidence than his confirmatory declarations not under oath; and the repetition of his assertions does not carry his credibility further, if so far as his oath. We say in general, because there are exceptions; but they are of a peculiar nature, not applicable to the circumstances of the present case : as where the testimony is assailed as a fabrication of a recent date, or a complaint recently made; for there, in order to repel such imputation, proof of the antecedent declaration of the party may be admitted.

It is true, that in Lutterel v. Reynell, 1 Mod. Rep. 282, it was held, that though hearsay be not allowed as direct evidence, yet it may be admitted in corroboration of a witness's testimony, to show that he affirmed the same thing upon other occasions, and that he is still constant to himself. Lord Chief Baron Gilbert has asserted the same opinion, in his Treatise on Evidence, page 135. But Mr Justice Buller, in his Nisi Prius Treatise, page 294, says, " but clearly it is not evidence in chief; and it seems doubtful whether it is so in reply or not." The same question came before the house of lords, in the Berkeley Peerage case; and it was there said by lord Redesdale, that he had always understood that for the purpose of impugning the testimony of a witness, his declarations at another time might be inquired into; but not for the purpose of confirming

his evidence. Lord Eldon expressed his decided opinion, that this was the true rule to be observed by the counsel in the cause.(a) Lord Chief Justice Eyre is also represented to have rejected such evidence; when offered on behalf of the defendant in a prosecution for forgery.(b) We think this is not only the better, but the true opinion; and well founded on the general principles of evidence. There is this additional objection to the admission of the confirmatory evidence in the present case, that it is of subsequent declarations; which would enable the witness at any time to control the effect of the former declarations, which he was concious that he had made, and which he might now have a motive to qualify or weaken, or destroy.

In the farther progress of the cause, the tenants, in order to prove the boundaries of the demandants' land, as laid down in the plat, and claimed by them; gave in evidence the original plats and certificates of survey of Kincaid's two thousand and one thousand acre tracts; and then examined M'Neal, a witness of the demandants, who was first introduced to prove their boundary: who stated that the water courses, as found on the ground, did not correspond with those represented on the said plats: and after being examined by the demandants, for the purpose of proving that the marks on the trees, claimed by them as the corner and lines of their surveys, were as ancient as the said surveys, and also as to the position and otherwise of the lines and corners claimed by them, and represented on the plat made and used at the trial; stated, on the cross examination of the tenants' counsel, that some of the lines, marked to suit the calls of the said surveys, appeared to be younger, and others, from their appearance, might be as old as the date of the said plats. The demandants, to counteract this evidence, and to sustain their claim; offered in evidence a survey, made out by M'Neal, in an action of ejectment formerly depending between the same parties for the same land, of which survey Pearl had due notice. The tenants objected to the reading of the explanatory report accompanying this survey, and the court refused to allow so much thereof as stated the appearance as to age and otherwise of the lines and corners to go in evidence to the jury; and accordingly caused to be erased from the plat the words following, viz. "ancient" (chops);—"John Forbes, Jun.,

(a) Cited in 1 Phillips on Evidence, ch. 8, page 213, note, [230 note]; 1 Starkie's Evidence 187, second London edition, and note (n).
(b) Ibid.

[Ellicott v. Pearl.]

states he cut the same letters and figures ;"—" on the east side, the chops appear to have been marked with a larger axe, than the chops on the beginning tree ;"—and then permitted the residue of the report and plat to go in evidence. This constitutes the third exception of the demandants.

We are of opinion, that there was no error in this refusal of the court. Strictly speaking, the demandants had no right, upon the principles already stated, to give in evidence any other prior statements of M'Neal to confirm his testimony. But, in truth, the evidence was offered to discredit, in part, his present testimony : and certainly the demandants were not at liberty to discredit their own witness by showing his former declarations on the same subject ; though they might show by other witnesses that he was mistaken. But independent of these objections, the evidence was inadmissible upon general principles. It was mere hearsay. The survey, made by a surveyor, being under oath, is evidence as to all things which are properly within the line of his duty. But his duty is confined to describing and marking on the plat, the lines, corners, trees, and other objects on the ground, and to subjoin such remarks as may explain them : but in all other respects, and as to all other facts, he stands, like any other witness, to be examined on oath in the presence of the parties ; and subject to cross examination. The reason why a survey, made by a public surveyor in discharge of his public duties, is admitted as evidence in suits between other parties, is, not that it is hearsay ; but that the act is officially done under oath, and in discharge of his duties to the government and the public. But it has never been supposed, that if in such a survey the surveyor should go on to state collateral facts, or declarations of the parties, or other matters, not within the scope of his proper official functions ; he could thereby make them evidence as between third persons.

In the further progress of the trial, the demandants, after the evidence was closed on both sides, moved the court to instruct the jury that if they believed, from the evidence, that the survey of Remey and the adjoining survey of Thompson, were, in point of fact, made at the mouth of Pond Creek, by beginning at or near the letter L, on the plat, that the law locates the patent on the ground where it was actually surveyed, notwithstanding the call or reference on the said patents, or either of them, to [for] the mouth of Raccoon creek ; and if they found that the patent of Remey, as surveyed, does not interfere with the claim of the demandants, that they ought to find

for the demandants; unless they find that the defendants have had possession by an actual residence or *fence* within the patent of the demandants thirty years or more before the bringing of these [suits]. The court refused to give this instruction, as moved; but gave the instruction as moved after substituting for the word *"fence"* the words "improvements with the intention of taking possession." To which refusal the demandants excepted.

It is wholly unnecessary for us to consider whether the instruction, as given, is maintainable in point of law or not; and the only question is, whether the refusal to give it as prayed for, was incorrect. But this resolves itself into the point, whether it is absolutely necessary to constitute a possession of land, sufficient to bar an adverse title thereto under the statute of limitations limiting writs of right to thirty years, that there should be an actual residence or fence by the party claiming the benefit of the statute; that is, an actual residence on the land, or a pedis possessio of it by an enclosure. The argument in support of the instruction, as prayed, assumes that there can be no possession to defeat an adverse title, except in one or other of these ways; that is, by an actual residence, or an actual enclosure: a doctrine wholly irreconcilable with principle and authority. Nothing can be more clear, than that a fence is not indispensable to constitute possession of a tract of land. The erection of a fence, is nothing more than an act presumptive of an intention to assert an ownership and possession over the property. But there are many other acts, which are equally evincive of such an intention of asserting such ownership and possession: such as entering upon land and making improvements thereon; raising a crop of corn; felling and selling the trees thereon, &c.; under colour of title.

An entry into possession of a tract of land, under a deed containing specific metes and bounds, gives a constructive possession of the whole tract, if not in any adverse possession; although there may be no fence or enclosure round the ambit of the tract, and an actual residence only on a part of it. To constitute actual possession, it is not necessary that there should be any fence or enclosure of the land. If authority were necessary for so plain a proposition, it will be found in the case of Moss v. Scott, 2 Dana's Kent. Rep. 275; where the court say, that "it is well settled that there may be a possession in fact of land not actually enclosed by the possessor." But this subject will naturally arise and be considered more fully under the next instruction prayed for: and it is only necessary to say, that we per-

[Ellicott v. Pearl.]

ceive no error in the refusal of the court to give that which was here prayed for.

The demandants then prayed the court to instruct the jury " that unless they find that Remey's survey covers the patents under which the demandants claim, the settlement of M'Cammon within the two thousand acres does not give a claim to a possession within the one thousand acres patent ; nor does the possession within the one thousand acres patent give any possession within the two thousand acres patent. That, as to the two thousand acres, the statute runs as to that from the time a possession was taken by an actual residence, or by fencing ; and the same as to the one thousand acres : consequently, that if they [the jury] find that one has been thus possessed adversely for thirty years next before the bringing of this suit, and the other not ; that as to the other not so held, they should find against such tenants as were within such patents at the date of the demandants' writ ; provided these settlements are not included in Remey's or Thompson's surveys, as originally surveyed."

The latter part of this instruction as prayed, is disposed of by the considerations already suggested under the preceding head. The other part may require some further explanations, in order to show its bearing and pressure. The tract of seven thousand acres conveyed by Edwards to Pearl, included, as has been already stated, both of the tracts of two thousand acres and one thousand acres claimed by the demandants, within its boundaries. The house and settlement of Pearl were on the southern side of the one thousand acres tract ; and the house and settlement of M'Cammon were within the two thousand acres tract, and near the centre of the eastern line of that tract. Pearl entered into possession of the seven thousand acres tract under his deed from Edwards ; and as that deed described the tract by metes and bounds, Pearl must, upon the principles already stated, be deemed to have been in possession of the whole tract ; unless some part of it was, which is not shown, in the adverse possession of some other claimant. In short, his entry being under colour of title by deed, his possession is deemed to extend to the bounds of that deed ; although his actual settlement and improvements were on a small parcel only of the tract. In such a case, where there is no adverse possession, the law construes the entry to be co-extensive with the grant to the party ; upon the ground that it is his clear intention to assert such possession. This doctrine is well settled. It was affirmed by this court in Barr v. Gratz, 4 Wheat. Rep. 222, 223 ;

and it has been fully recognized and acted upon by the state courts of Kentucky. In Fox v. Hinton, 4 Bibb's Rep. 559, it was held by the court, that where two patents interfere in part, and before possession is taken under the elder patent, the junior patentee enters upon the land within the interference with an intention to take possession, he shall be construed to be in possession to the extent of his claim. In Thomas v. Harrow, 4 Bibb's Rep. 563, the same court held that a person entering on land under a deed of conveyance specifying the boundaries, is in possession to the extent thereof; although the person making the conveyance had only an entry, which did not appear to cover the land, and which had not been perfected by survey or patent. The cases of Smith's Heirs v. Lockridge, 3 Littell's Rep. 19, 20 ; Cates v. Loftus, 4 Monroe's Rep. 442; Moss v. Currie, 1 Dana's Kent. Rep. 267 ; Boyce v. Blake, 2 Dana's Kent. Rep. 127; Smith's Heirs v. Frost's Devisee, 2 Dana's Kent. Rep. 148, 149 ; and Harrison v. M'Daniel, 2 Dana's Kent. Rep. 354, are to the same effect, and contain a full exposition of the doctrine.

M'Cammon having entered under Pearl, his possession must be deemed consistent with the title of Pearl. There is, however, no proof of the nature or extent of his claim in the case. If he entered under a deed from Pearl, then his possession would be coextensive with the boundaries prescribed in that deed. If he entered without deed, his possession must either be deemed a continuation of that of Pearl, or bounded by his actual occupancy. In Jones v. Chiles, 2 Dana's Rep. 28, it was held by the court, that if a landlord settles a tenant without bounds upon a tract of land, he is in possession to the limits of the claim. But if the tenant is restricted by metes and bounds, to a part only of the land ; the landlord's possession is in like manner limited. And upon the same principles the court held, that if the proprietor of a tract sells a portion of it designated by metes and bounds, and the vendee enters into possession, his entry must be deemed of his own land, only ; and it has no effect as an entry upon or possession of the rest of the tract.

If with these principles in view we examine the instruction asked of the court, it will be found open to much objection. It assumes certain facts as its basis, which were not in evidence ; or, if in evidence, they were for the decision of the jury. The court were asked to instruct the jury, " that the settlement of M'Cammon within the two thousand acres tract, did not give a claim to a possession within

the one thousand acres tract," without ascertaining whether the claim or title of M'Cammon extended into the latter or not. Now, it is plain that if his claim or title did extend into the latter, he would have had a constructive possession to the extent of that claim or title. The other part of the instruction asked is extremely vague. It is, "nor does the possession within the one thousand acres patent give any possession within the two thousand acres." It is not said by whom the possession is supposed to be, whether by M'Cammon or by Pearl, or by any other person. If the possession intended was that of Pearl, as both tracts were within his tract of seven thousand acres; it is clear that his possession would extend over both tracts, upon the principles already stated. If the possession intended was that of M'Cammon, it is open to the objection already stated, that the boundaries of his claim or title are not ascertained, so as to enable the court to give the instruction as matter of law. In truth, the instruction asked seems to have proceeded upon a ground perfectly untenable in itself; and that is, that as to third persons, who are in under title or colour of title, their possession is to be bounded and limited by the nature and extent and origin of the distinct titles of their adversary; and not by that under which they themselves have entered and taken possession. For these reasons we are of opinion that the instruction was properly refused by the court.

The last exception now insisted on, is in the following instruction, given by the court upon the prayer of the tenants. "That if they [the jury] find, from the evidence, that Remey's patent does not cover the land in contest, yet if they find, from the evidence, that the tenants, or any of them, or those claiming under them, have had possession of the land in contest for thirty years next before the commencement of the demandants' suit, they must find for the tenants." It is probable that the actual form in which this instruction was asked, was occasioned by the agreement of the parties, that all these actions against the different tenants upon the different writs of right "should be heard at the same time," without prejudice to the rights of either party; and that the evidence "should be heard as to all, and to be applied to each respectively," and therefore that the instruction should be construed accordingly, reddendo singula singulis. But we see no objection to it in the form in which it was actually given, under the circumstances of the present case, and the titles set up by the parties respectively. The demandants claimed adversely to all the tenants, upon a title independent and distinct from theirs. The

[Ellicott v. Pearl.]

tenants all claimed under the title of Pearl, by his deed of the seven thousand acres, that is, under a title common to them all. The demandants could not recover any tract in controversy, unless they were seised thereof within thirty years, the period prescribed by the statute of limitations for writs of right. If, therefore, there had been thirty years adverse possession of the particular tract in controversy, by any of the tenants, the demandants had failed in their suit, and were barred from any recovery. This was the whole purport of the instruction given; and, in our judgment, it was perfectly correct. It has been supposed, at the argument, that the instruction was defective in not stating that the possession was adversary and uninterrupted during the whole thirty years: and the case of Forman v. Ambler, 2 Dana's Kent. Rep. 109, 110, is relied on to sustain the objection. But the court in that case admitted, that the instruction was free from legal exception, as understood by the court and the parties. And whatever ground there might be for the court, in that case, to come to the conclusion that the jury might have been misled by it, (with which we do not intermeddle), under the peculiar circumstances of the case; we are of opinion that, under the circumstances of the present case, the instruction was definite and unambiguous in its purport and effect, and such as the law justifies.

Upon the whole, the judgment of the circuit court is affirmed with costs.

This cause came on to be heard on the transcript of the record from the circuit court the United States for the district of Kentucky, and was argued by counsel; on consideration whereof, it is ordered and adjudged by this court, that the judgment of the said circuit court in this cause be, and the same is hereby affirmed, with costs.